Filed 9/18/24  In re D.H. CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re D.H. et al., Persons Coming Under the Juvenile Court Law. | D083726 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J521299A,B,C) |
| v. | |
| T.H. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant T.H.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant D.M.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief County Counsel, Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

In September 2023, then five-month-old Tyler was brought to Rady Children's Hospital where a doctor concluded he was suffering from a femur fracture that was more likely than not the result of child abuse. Tyler's parents, T.H. (Father) and D.M. (Mother), claimed they had not witnessed Tyler suffer the injury and suggested Tyler's then almost-two-year-old sister (Sister) may have caused the injury by jumping into Tyler's playpen. A doctor found the parents' explanation implausible because Tyler's injury had to have been caused by a "twisting or yanking" force. The doctor therefore believed Tyler's fracture was not an accident caused by Sister jumping in his playpen; instead it had been inflicted on him. The San Diego County Health and Human Services Agency (the Agency) investigated the doctor's concerns and filed a petition on Tyler's behalf under Welfare and Institutions Code[1] section 300, subdivision (a). The Agency also filed petitions under section 300, subdivision (j) on behalf of Sister and Tyler's then nine-year-old brother (Brother).[2]

At the joint jurisdiction and disposition hearing, the trial court found the jurisdictional allegations in the petitions true. Father and Mother appeal from the jurisdictional findings only, asserting there is insufficient evidence to support them. They claim the evidence presented at the contested hearing demonstrates that Tyler was not in the exclusive care of one or both parents at the time he suffered his injury. Instead, they imply that Tyler's maternal grandmother may have caused his injury when she briefly picked up Tyler

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

[2]     Brother is a maternal half-sibling to Tyler and Sister. His alleged father never elevated his paternity status, and, at trial, the court found Father, who is Tyler and Sister's father, to be Brother's presumed father.

from his car seat and fed him a bottle. The presence of evidence of the maternal grandmother's handling of Tyler during the relevant time period, they assert, renders the evidence insufficient to support the trial court's determination Tyler's injury was inflicted on him by Father or Mother.

We conclude the court's jurisdictional findings as to all three children are supported by sufficient evidence. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Discovery of Tyler's Injury*

On September 4, 2023, then five-month-old Tyler was brought to the emergency room at Rady Children's Hospital (the Hospital) by his parents. They reported Tyler had been "fussy" since September 1, and one of his legs had noticeable swelling as of September 3. Although Tyler had been seen at a medical clinic on September 2 and released from care without diagnosis, the staff at the Hospital found that Tyler was suffering from a fracture to his left femur. Tyler's parents indicated they had not seen the injury occur, had not heard him scream out in pain, and did not know how it happened. They speculated it might have resulted from Sister climbing into his playpen and falling onto him.

Dr. Natalie Laub, a pediatrician on the Hospital's "Child Protection Team," found the parents' explanation implausible because the type of injury Tyler had suffered was caused by "twisting or yanking." The doctor believed this type of injury could not have been caused by a toddler, and it had instead been purposefully inflicted on Tyler. She also noted that the parents had been "difficult and defensive" when questioned about the injury.

When a police officer interviewed the parents separately, they each recounted a similar timeline. Mother and Father indicated Tyler was crying, and he was "clearly upset every time he was picked up" on September 1. The

3

parents took him to a medical clinic on September 2, where a doctor told them Tyler was having a "viral issue or teething." However, Tyler's disposition did not improve with the Motrin and teething crackers prescribed, so on September 3 at around 10:00 p.m., Mother decided to take Tyler to the Hospital.

Dr. Laub prepared a medical evaluation report dated September 5, 2023. In it, she noted that Tyler showed "normal bone morphology and normal labs," and further explained there was no medical evidence Tyler suffered from an underlying bone fragility disorder. Dr. Laub concluded that the parents' speculation about Sister causing the break was not plausible because of the type of fracture Tyler suffered. Further, Tyler's age meant he was unable to self-inflict the injury, and, therefore, "Tyler's femur fracture is more likely than not the result of physical abuse."

On September 5, Mother told a social worker that on September 1 she had been alone with the three children in a home belonging to the children's paternal grandmother while Father was working. Tyler was in his playpen and Sister was running around. She heard Tyler cry, and then she picked him up. She denied his cry was "any different" than usual or that he had been "fussy." She speculated to the social worker, as she had to staff at the Hospital, that Tyler had been injured when Sister climbed into his playpen, although she conceded she had not witnessed this happen. In fact, she denied having seen Sister inside Tyler's playpen at any point on September 1. When asked why she believed Tyler's injury had been caused by Sister jumping into his playpen, Mother responded it "was the only explanation."

On September 7, the maternal grandmother shared with a social worker that on Friday, September 1, she had gone to a local Target store to meet Mother, Brother, and Tyler. She planned to drop off formula with

4

Mother and take Brother to care for him over the weekend. The grandmother thought Mother appeared to be angry when getting out of her car, as if "something had happened." Tyler was in the backseat crying, and Mother told the maternal grandmother he had been crying "all morning." She suggested perhaps he was just hungry. The maternal grandmother took Tyler out of his car seat, and he "gave a scream, which was beyond normal crying." She believed he was in some sort of pain. She held him in her arms with one hand on his buttocks and thigh to feed him a bottle, and he continued crying abnormally. However, when she changed his position so that his head was up by her shoulder and his legs were down, he "calmed down a little." The maternal grandmother encouraged Mother to take Tyler to the doctor. Mother indicated Father would be taking him to the doctor on Saturday morning.

According to the maternal grandmother, while she was with Brother over the weekend, he told her that before the meeting at Target, he and Sister had been playing outside the home where they were staying while Mother was inside with Tyler. Brother reported that he saw Father come home, heard Tyler "cry loud," and watched Father leave. According to Brother's account, after Father left he and Sister then went inside the home, where he saw Mother holding Tyler. The maternal grandmother expressed concern that Father might retaliate against her for talking with the social worker, noting his "aggressive and angry personality."

The social worker spoke with Brother on September 7. He shared with the social worker that on September 1, he had been playing outside with Sister at their paternal grandmother's home. Father was at work when the pair went outside to play, but at some point he saw Father return to the home and go inside. According to Brother, while Father was inside, he heard

Tyler "cry 'really loud.'"  He described it as being " 'different than his regular cry,'" and it sounded like " 'a painful cry.'"  Brother indicated he then saw Father leave the home looking upset.

Brother wanted to know what had happened, so he and Sister went inside.  He described seeing Mother with Tyler on the couch.  Tyler was still crying.  Brother explained that he observed Mother " 'looking stressed.'"  When the social worker asked him how he knew Mother was stressed, he said he " 'just know[s] [his] mom'" and " 'know[s] what her stressed face looks like.'"  Brother also told the social worker that Father " '[i]s mean'" to him, forces him to "call [Father] Dad," and "will throw [him] against the wall or against the bed" if he does not do what Father "wants."  He reported that Mother sometimes " 'smack[ed] [him] on the mouth,'" and that on at least one occasion, this caused him to bleed.

Brother told the social worker he wanted to live with his maternal grandmother.  Mother had asked the maternal grandmother to care for Brother in her home, and she also requested the maternal grandmother not speak to anyone at the Agency.

In a September 11 discussion with a social worker, Dr. Laub added to her prior report her belief that the fracture would have been "obvious" to the parents because it would have been "very painful" when it occurred.  In her view, Brother's report of what he had heard and witnessed on September 1 was "more consistent with what could have occurred" than the parents' speculation about how the injury happened.  She also noted that the maternal grandmother's report about how Tyler was "inconsolable" when she saw him in Mother's car that day, and her description of how Tyler responded when she picked him up and held him, were both consistent with the pain Tyler would have been suffering from the fracture.  When the social worker

6

asked whether there would have been visible swelling at that time, Dr. Laub indicated because Tyler was "quite chubby," any swelling may not have been immediately noticeable, and the swelling would have gradually increased over a period of days after the injury was sustained. She reaffirmed that a toddler child falling onto Tyler would not have caused the oblique fracture he suffered, adding that it would have been caused by a "violent grab" and " 'really aggressive' " twisting and bending of his leg.

The social worker memorialized this information in detention reports. She also noted that the Agency had substantiated an allegation of general neglect regarding the care of Brother in March 2017. The Agency opened a voluntary case for Mother regarding Brother from May to September 2017, but Mother did not appear to have completed the voluntary services provided to her, and the Agency had been unable to contact the family after September 30, 2017.

The Agency filed petitions under section 300 for Tyler and Sister on September 13, 2023. A joint detention hearing was held five days later. The court appointed counsel for the two children and ordered them detained.

The Agency filed a section 300 petition for Brother on September 19. At the detention hearing held the following day, the court appointed him counsel, and that attorney indicated she had spoken with him earlier that morning. Brother indicated to her that "the social worker got the story wrong." Brother's counsel shared that as of the date of the detention hearing, Brother "denies that [Father] was present the day his younger brother was heard crying," "denies that [Father] has ever hurt him in any way physically," "denie[s] that [Father] has ever thrown him against a bed" or "threw him against a wall," and "denies any abuse in the home."

7

He shared with his attorney that he "does not know exactly what happened to his younger sibling," and his "position is he would like to be detained with [Mother]." In the alternative, he requested placement with his maternal grandmother. But counsel, who was also acting as the children's guardian ad litem, nonetheless agreed with the Agency's recommendations, including the recommendation that Brother be removed from the parents' home. An attorney for the Agency noted its concern that it was only after Brother had been returned to Mother and Father's care that he disclaimed the detailed reports he previously made to a social worker and his maternal grandmother. The court ordered Brother detained out of his parents' home.

The court ordered supervised visitation for the parents as to all three children.

B.    *Evidence Collected During the Jurisdiction-Disposition Reporting Period*

Once the children were detained, the Agency continued to investigate and talk with the involved parties. The Agency's jurisdiction-disposition report dated October 9, 2023, memorialized these conversations, as well as the Agency's provision of services to the parents. During a discussion a social worker had with Father, he reported that neither he nor Brother were at the paternal grandmother's home on September 1, as Brother had reported. Rather, he asserted, only Mother, Sister, and Tyler were at the home because he (Father) had left early in the morning for work and Brother was with his maternal grandmother in Temecula that day. The maternal grandmother's report to the social worker partially conflicted with Father's statement, as she indicated she picked up Brother from Mother in the Target parking lot at approximately noon on September 1. This meant Brother would have been with Mother, Sister and Tyler for a portion of that day.

8

In light of all of the information gathered, the social worker recommended the trial court find the children's petitions true, remove them from parental custody, and order reunification services for the parents.

In the meantime, the Agency requested court approval to place all three children in the home of their maternal aunt in Murrietta, California. The maternal grandmother also lived in Murrietta, and the record suggests the maternal grandmother and maternal aunt lived in the same residence. The court approved the placement on October 7.

The jurisdiction-disposition hearing was set to take place on October 9. When the parents requested a trial, however, Mother's retained counsel was relieved and new counsel appointed. The court therefore set the matter for a contested hearing in January 2024.

Prior to the contested hearing, the Agency filed an addendum jurisdiction-disposition report dated December 13, 2023. In this report, a social worker described what Brother said during an October 12 private meeting. When the social worker asked Brother what had happened on September 1, he said the previous social worker had "twisted his words." He indicated he did not know why Tyler had cried out in pain, and he never saw anyone hurt Tyler. But he acknowledged Tyler was crying a lot, "and it seemed different." In addition, Brother again described how Father sometimes hits or throws him against the wall. Brother demonstrated what had happened during one particular incident using the social worker's backpack to show how Father had thrown him. Brother admitted he had not shared what had happened to him with Mother because he was "too scared." He also described witnessing fights between Mother and Father, and he recalled a time when Father tried to hit the maternal grandmother.

9

Brother told the social worker he did not feel safe at his parents' home. He reported feeling "safer" at his maternal grandmother's home, and he was unable to say what would need to change in order for him to feel safe in his parents' home.

Mother expressed concern Brother was being encouraged by the maternal grandmother to make negative disclosures about Father. Mother and the maternal grandmother exchanged accusations that the other had been coaching Brother to say certain things. Mother reported to the social worker that Brother had told her he wanted to see Father. The maternal grandmother reported she heard Brother tell Mother during a telephone call that he missed Father. But after the call, he was physically sick and said he did not want to see Mother because she kept asking him about Father. He also said he did not want to see Father, but he was afraid to tell Mother. The social worker spoke with Brother, alone, and he independently told her he did not want to visit with Mother. He explained that Mother makes him say he loves Father, but he is too scared to tell Mother he does not feel that way.

At a pretrial status conference held in mid-December 2023, Brother's attorney shared with the court that he had expressed to her he did not want to return to Mother's care and did not want to visit or have phone calls with her. Brother had declined visits with Mother in late November and early December, and he later declined a visit scheduled at the end of December.

In a second addendum report, the Agency recommended the children be removed from the care of the maternal grandmother and maternal aunt and be placed in the home of a different approved relative or extended family member, or in a licensed foster home. As reasons for the change, the Agency cited the maternal grandmother's difficulty in obtaining services provided in San Diego County, given that she lives in Murrietta, as well as concerns she

was speaking about the case in front of the children. Even so, Brother expressed a desire to stay with his maternal grandmother "forever." The Agency believed placing the siblings together would be in their best interest, and further believed the maternal grandmother would not sufficiently support reunification efforts between Brother and the parents. In early January, the court authorized the Agency to move the children to a licensed foster home and continued the contested jurisdiction-disposition hearing at the Agency's request.

In mid-January 2024, Brother participated in a forensic interview at the Chadwick Center. He told the interviewer about instances during which Father physically abused him, as well as instances where he suffered neglect while in the parents' care. His stories were generally consistent with his previous statements regarding abuse by Father. He reiterated his observations as to what occurred on September 1, 2023, regarding the parents and Tyler. This included reporting that he saw Father return home and go inside, heard Tyler cry, saw Father leave, and went inside to find Mother holding Tyler. Brother told the interviewer he loves Mother, but he did not feel safe living with her because Father hits him. The interviewer asked Brother if someone in his family told him what to say or not say, but he denied having been coached.

C.    *The Contested Jurisdiction-Disposition Hearing*

The contested jurisdiction-disposition hearing began in early February 2024 and took place over multiple days. A social worker testified regarding much of what had been included in the Agency's reports up to that point. She noted the fairly consistent timeline for Tyler's injury provided by Father and Brother, who both repeatedly indicated they believed Tyler had been injured on September 1 because that was the day he started acting fussy or crying in

11

an unusual way. The social worker acknowledged, however, that Brother's account of other events had varied, explaining how on multiple occasions he had provided a very specific version of events he observed on September 1, while at another point in time he denied having observed those things. The social worker also noted that by the time of the hearing, while Mother continued to say she noticed Tyler being unusually fussy on September 1, she now believed Tyler's injury occurred *after* she met the maternal grandmother at Target, which would have been sometime after noon on September 1.

The social worker acknowledged that Father had shown her timecards from his workplace suggesting he had been at work all day and did not come home for lunch on September 1, 2023. She also agreed that Mother sent her videos of Sister climbing into the pack and play on at least one occasion. The court admitted one of these videos in evidence.[3]

The Agency called Dr. Sara Kruczek, who is a child abuse pediatric fellow at the University of California, San Diego and practices at the Hospital. The court designated her as an expert in child abuse. Dr. Kruczek had reviewed Tyler's medical records and imaging from his September 4 visit to the Hospital, Dr. Laub's medical evaluation report, medical documents from Tyler's visit to the medical clinic on September 2, the Agency's reports, a report by a police officer, and the videos Mother had sent to the social worker. It was Kruczek's opinion after reviewing these items that Tyler's femur fracture was more likely than not the result of physical abuse. The fracture was "oblique," which meant that it was "more of a diagonal or a sloped

---

[3]　This video was intended to be an example of how Sister would get into the playpen, and it was not suggested the video depicted the incident that caused Tyler's injury, since according to the parents no one had witnessed it.

fracture." An oblique fracture is the result of a "bending *and* twisting force." (Italics added.)

Mother and Father each designated a medical expert to testify. Mother called Dr. Peter Hahn, a pediatric orthopedic surgeon who specializes in muscular skeletal conditions. He prepared an expert report the court received in evidence. In that report, Dr. Hahn indicated he had reviewed medical records and imaging from the Hospital, as well as the agency's petitions and reports. Hahn's report credited Mother's contention that the injury to Tyler resulted from Sister jumping into his playpen, and he agreed a jump by a toddler from a height of three feet could have caused the femur fracture. He noted that "a normal 2-year-old by weight would not have enough force at ground level to break a femur," but a jump "from an extended height" could potentially do so. When questioned at the hearing, however, Hahn conceded he did not know Sister's weight at the time Tyler was injured. He had not seen any photographs or videos, and was unaware of how Sister entered the playpen.

Father called Dr. Thomas Grogan, a pediatric orthopedic surgeon. To prepare his report, Dr. Grogan reviewed the same information Dr. Hahn had reviewed. Grogan opined that Tyler could have sustained a nondisplaced crack in his femur as a result of Sister jumping into the playpen and landing on his leg, and the fracture then became displaced a day or two after it was initially incurred. It was Grogan's opinion that Tyler had sustained the injury accidentally because, in his view, there was no evidence of inflicted injury. He conceded, however, that he could not exclude the possibility the injury was inflicted.

At the hearing, Dr. Grogan explained that Tyler's leg would not have immediately exhibited swelling if the initial injury was a nondisplaced crack

13

in the bone. Thus, he believed Tyler's femur could have been cracked when he was taken to the medical clinic on September 2, but the fracture may have become displaced at some point after that visit. Grogan explained that once a fracture becomes displaced, it begins to swell within a matter of minutes. Swelling can be delayed, however, depending on the amount of tissue that surrounds a subject's bone, and it could "take longer for the swelling to be apparent" in a child "with a chunkier thigh." According to Grogan, Tyler's fracture had occurred within five to seven days of him being seen at the Hospital. Grogan acknowledged that femur fractures in non-mobile children are "incredibly rare," and the type of fracture Tyler suffered resulted from a "bending and rotating" force.

In closing arguments regarding the jurisdictional issue, Father and Mother asked the court to dismiss Tyler's petition or, alternatively, to conform the petition to proof under subdivision (b) of section 300.[4] Through their attorney, the children asked the court to find the petitions true in order to permit the court to exercise jurisdiction over them.

The court sustained the petitions as to all three children. It specifically relied on Dr. Laub's opinion and the facts as she reported them in concluding it was more likely than not that Tyler's rare femur fracture had been inflicted nonaccidentally by one of his parents. The court also credited Dr. Kruczek's testimony, finding her demeanor credible and her opinion well-reasoned. It declined to give much weight to the opinions provided by Drs. Grogan and Hahn because those opinions had relied on Mother's statement that Sister had jumped on Tyler's leg, but there was no real evidence this is what had

---

[4]     We limit our description of these procedural matters to issues involving jurisdiction and not those related to disposition, as the parents challenge only the court's jurisdictional findings.

14

occurred.  The court found that the video Mother provided to the social worker significantly undermined the theory of the injury that Mother offered, as well as the expert opinions founded on this version of events, because it showed Sister sliding into the playpen, not jumping.

The court found credible Brother's initial disclosure to his grandmother and a social worker and his subsequent disclosure during the forensic interview about what he had observed on September 1.  It also believed Brother when he reported that Father had physically abused him in the past. In the court's view, there was little concern Brother's initial disclosure was the result of coaching because that disclosure occurred very shortly after the Agency became involved with the family.

In addition, the court watched the video of Brother's later forensic interview multiple times and found his recounting of these events to have been not only consistent with his prior statements, but also very credible given the specificity of his descriptions and his demeanor.  It noted Brother had disclosed during this interview that Mother had told him not to tell others the things he had recounted about Father's conduct.  For these and other reasons, the court found Brother's initial and subsequent disclosures about what he had experienced and observed while in the care of the parents to be credible, while it declined to give much weight to Brother's retraction of these stories to his attorney a few weeks after his initial disclosure.  After assessing all of the evidence, particularly the medical evidence, and crediting many of the statements provided by Brother, the court found by a preponderance of the evidence Tyler's injury had been inflicted nonaccidentally by one of his parents, which warranted the juvenile court's exercise of jurisdiction.

15

The court then considered Sister's and Brother's petitions. It remarked on Sister's young age and vulnerability in determining that there existed a substantial risk of harm to her, justifying the court's exercise of jurisdiction over her. When considering Brother's petition, the court expressed concern for Brother's safety and well-being, noting the evidence of past abusive conduct directed at him by Father. It determined there was a substantial risk of harm to Brother, as well. Accordingly, the court found that the evidence supported sustaining the petitions under section 300, subdivision (j) as to Sister and Brother.

## DISCUSSION

Father and Mother challenge the sufficiency of the evidence to support the trial court's jurisdictional findings. Specifically, they contend the evidence is insufficient to support what they argue was the trial court's implicit conclusion that Tyler was in the parents' exclusive care at the time he suffered the leg fracture. Instead, according to Father and Mother, the evidence demonstrates that the maternal grandmother handled Tyler during the time frame identified by doctors as the period during which the injury may have occurred, and therefore it is possible Tyler suffered the injury as a result of something she did. This, they maintain, renders the evidence insufficient to support the court's jurisdictional findings with respect to all three children.

A. *Legal Standards*

Juvenile dependency proceedings are intended "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) In order for a court to

16

exercise jurisdiction over a child under the juvenile dependency statutory framework, it must find the child falls within one or more of the provisions of section 300. This section includes several subdivisions describing children who may be adjudged dependents of the court.

A trial court must make its jurisdictional findings by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) And on appeal, we review a court's jurisdictional order for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*In re I.J.*).) In applying this standard, " ' "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Id.* at p. 773.)

B. *Substantial Evidence Supports the Trial Court's Section 300, Subdivision (a) Jurisdictional Finding as to Tyler.*

The trial court found Tyler met the definition of a child subject to the jurisdiction of the court as set out in section 300, subdivision (a). This provision allows a court to exercise jurisdiction over a child if "[t]he child has suffered . . . serious physical harm inflicted nonaccidentally . . . by the child's parent." (*Ibid.*) The court need not determine conclusively which parent inflicted the harm in order to exercise jurisdiction. (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved of on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

Tyler's petition alleged that on or around September 1, 2023, the parents subjected him to physical abuse that resulted in an "acute oblique

17

fracture of the proximal left femur." Father and Mother argue the evidence is insufficient to support the trial court's determination that Tyler suffered the alleged harm at their hands because there was evidence Tyler had also been in the care of his maternal grandmother during the time period when he is believed to have suffered the fracture. We disagree the evidence is insufficient to support the trial court's jurisdictional finding as to Tyler.

The record makes clear the court weighed all of the evidence before it in reaching the conclusion that it was more likely than not one of Tyler's parents who nonaccidentally caused his injury. Considered as a whole, the evidence fully supports the court's determination. For example, statements made by Brother and the maternal grandmother were consistent with the court's conclusion that Tyler suffered his injury while in the care of his parents, and that the injury was inflicted nonaccidentally. Most significant were Brother's statements about his observations on September 1. What he heard and saw supported the inference Tyler was injured while at home when both parents were present, and the court heavily credited Brother's statements in this regard. The court believed these statements, in part, because Brother had "nothing to gain from lying," given his love for his mother and his awareness of what the case was about. Further, Brother had been asked by the forensic interviewer whether his statements were the product of someone telling him what to say, and he denied he had been coached. In fact, the court gave multiple specific reasons why it was crediting certain of Brother's statements made during the Agency's investigation and discrediting the statements he made recanting his initial disclosures. The court acted well within its discretion in finding Brother credible with respect to the key statements he made during the investigation, but not credible when he attempted to disclaiming those same statements. (See *People v.*

18

*Williams* (1992) 4 Cal.4th 354, 364 [a trier of fact is permitted to credit some portions of a witness's statements and not credit other portions].)

The court's conclusion that Tyler's injury was more likely than not caused nonaccidentally by one of his parents was further supported by the maternal grandmother's statements to social workers about what happened when she met Mother, Tyler, and Brother at the Target parking lot on September 1. According to the maternal grandmother, when they met that day, Mother appeared upset or angry as she got out of her car. Tyler was already crying when Mother arrived, and Mother told the maternal grandmother that Tyler had been crying all morning. Then, when the maternal grandmother unbuckled Tyler and took him out of his car seat, she heard him scream "beyond normal crying," and she surmised he was in pain. The maternal grandmother held Tyler and fed him a bottle. At first his head was resting on her arm, and she was supporting his buttocks and thigh with one of her hands. While in this position, Tyler continued crying abnormally. She then moved him so that his head was up against her shoulder and his legs were down, and she noticed him calm a bit.

Based on Brother's statements and the maternal grandmother's statements, the court could have reasonably concluded that Tyler suffered his injury *before* Mother took him and Brother to the Target to meet the maternal grandmother. At trial, the parents argued that Tyler's injury could not have occurred until after the September 2 visit to the medical clinic, given the injury was not detected by a doctor there. But there was additional evidence, beyond the statements given by Brother and the maternal grandmother, that could have explained how medical staff failed to diagnose an already-existing femur fracture on September 2. For example, Dr. Hahn's testimony suggested it would have been difficult for even medical

19

professionals to have identified a recently-sustained injury such as the one Tyler suffered. He indicated "it's very hard to pick up on a femur fracture, even a displaced one," and opined that such a fracture might not swell to such a degree as to be visible in the one or two days after it was sustained. This explanation of why the injury might not have been detected by medical staff on September 2 was consistent with Dr. Laub's statement to the social worker that Tyler's baby "chubb[iness]" could have made it difficult for anyone to notice any swelling in Tyler that may have been present one or two days after the injury occurred.

Despite all this evidence, the parents for the first time suggest on appeal that the maternal grandmother may have caused Tyler's injury when she handled him on September 1.[5] They rely on the grandmother's own statements about how Tyler cried out in pain when she lifted him from his car seat to suggest it is possible she caused Tyler's injury when she handled him that day. However, there was no evidence beyond the fact that Tyler let out an abnormal cry when removed from his car seat to support an inference that Tyler's femur fracture occurred at that point. For example, doctors repeatedly indicated that the oblique fracture Tyler suffered was "caused by 'really aggressive' . . . twisting *and* bending of the leg." (Italics added.) According to Dr. Laub, such an injury "would have been caused by a 'violent grab' and leg being 'twisted and bent.' " But there is no evidence in the record to suggest that the maternal grandmother handled Tyler aggressively

---

[5]     Mother never suggested to social workers or doctors that the maternal grandmother's handling of Tyler in the Target parking lot might have been the cause of his injury. Nor were doctors asked prior to or during the contested jurisdiction-disposition hearing whether the evidence indicating the maternal grandmother handled Tyler and took him out of his car seat on September 1 could have supported the conclusion his injury was caused by that conduct.

or in any unusual manner, or that she somehow twisted and bent his leg on that day.

Rather than supporting an inference that the maternal grandmother *caused* the fracture when she lifted Tyler from his car seat, Tyler's abnormal cry more readily supports an inference that he had already suffered the fracture at that time, and it was his injured leg being moved that caused him to cry out in pain. This is particularly true when his cry is considered in the context of other evidence in the record. For example, when the maternal grandmother met Mother, Tyler and Brother at the Target at midday on September 1, she observed that Tyler was already crying. Indeed, Mother reported to her that Tyler had been crying "all morning." Brother gave statements during the Agency investigation indicating he heard Tyler cry out abnormally in pain that morning, before they went to the Target to meet the maternal grandmother. Finally, the absence of evidence in the record is also notable, in that there is nothing to suggest that a child who did not have a fragile bone condition could have suffered such an unusual femur fracture as a result of someone lifting him from a car seat.

Ultimately, the mere fact that the maternal grandmother may have briefly cared for Tyler during the period of time when the injury was likely suffered does not mean there is insufficient evidence to support the trial court's finding that Tyler's injury was inflicted nonaccidentally by one of his parents. Rather, the record contains more than sufficient evidence to support the trial court's jurisdictional finding as to Tyler.

C.      *Substantial Evidence Supports the Trial Court's Section 300,*
        *subdivision (j) Jurisdictional Findings as to Brother and Sister.*

The trial court found that Brother and Sister met the definition of children subject to the jurisdiction of the court as set out in section 300, subdivision (j), which permits a court to exercise jurisdiction over a child if two elements are met: (1) "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i)," and (2) "there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."  In deciding whether these elements have been met, section 300, subdivision (j) requires the trial court to "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

Brother's petition alleged he was at substantial risk of abuse or neglect as defined in the relevant subdivisions of section 300, and further alleged that Tyler, Brother's sibling, had been subjected to serious physical harm as defined by subdivision (a) of section 300.  Also included were allegations that Mother "has smacked the children in the mouth to the point of causing the child's mouth to bleed" and Father "has thrown the child against a wall and against a bed."  Sister's petition, like Brother's, alleged she was at substantial risk of abuse or neglect as defined in the relevant subdivisions of section 300, and included the same allegation regarding Tyler having been subjected to serious physical harm as set out under subdivision (a) of section 300.

22

The parents challenge the court's jurisdictional findings as to Brother and Sister in connection with both elements of section 300, subdivision (j). With respect to the first element—the requirement that a sibling has been abused or neglected, as defined in certain other subdivisions—the parents rely on their contention that the trial court's findings with respect to Tyler are not supported by substantial evidence. As we have already concluded, however, the evidence was sufficient to support the court's jurisdictional finding under section 300, subdivision (a) as to Tyler.

With respect to the second element, the parents challenge the sufficiency of evidence supporting the trial court's conclusions that there is a substantial risk Brother and Sister will be abused or neglected. Our review of the record confirms there is substantial evidence to support the trial court's exercise of jurisdiction over Brother and Sister.

As to Brother, the record includes evidence that he has already suffered abuse at Father's hands. Brother reported specific incidents during which Father "threw" him against a wall or a bed when Father was angry with him. These incidents allegedly happened when Mother was not present, and Brother did not disclose them to Mother out of fear his disclosures would upset her. In fact, he expressed such anxiety and concern about his treatment by Father that at many points during this process he communicated a preference to remain in his maternal grandmother's care, despite his clear love for Mother and general desire to be with her.

But the record also demonstrated that Mother's conduct could be abusive, as well. Brother reported incidents when Mother "smack[ed]" him on the mouth, and at least one of these times she caused him to bleed. This evidence, particularly when combined with the finding that Tyler had suffered abuse at the hands of Father or Mother, was substantial evidence to

23

support the trial court's finding Brother was at substantial risk of being abused or neglected as required by the second prong of section 300, subdivision (j).

With respect to Sister, we acknowledge there is no independent evidence of past abuse similar to what was introduced as to Brother. But it is clear that a court "need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) And there is evidence in the record indicating Sister's young age and accompanying vulnerability place her at high risk for abuse, given the substantiation of abuse inflicted on her younger sibling and the evidence of abuse directed at her older sibling. As Dr. Laub indicated, "literature and studies show" there is a " 'significant risk'" to siblings of physical abuse in a home where abuse is already occurring. She specifically noted that "toddlers are at high risk of abuse."

The trial court expressly identified Sister's young age and vulnerability as a concern and weighed this along with the other evidence in the record that demonstrated the parents' past abusive conduct toward her siblings. The sum of that evidence supports the trial court's determination that Sister was also at substantial risk of being abused or neglected. (§ 300, subd. (j).)

## DISPOSITION

The jurisdictional orders as to Tyler, Sister, and Brother are affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


CASTILLO, J.